UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY RAUL BARRON,

        Petitioner,

   v.

MIKE STAINER,

        Respondent.

_____/

No. C 11-02797 PJH

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND ISSUING CERTIFICATE OF APPEALABILITY**

Before the court is the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed by state prisoner Anthony Raul Barron ("Barron"). The briefs are fully submitted and court determines that the matter is suitable for decision without oral argument. Having reviewed the parties' papers and the record, and having carefully considered the relevant legal authorities, the court DENIES the petition.

**BACKGROUND**

**A.    Procedural History**

On August 22, 2006, a jury convicted Barron of assault with a deadly weapon and found true the allegation that the crime was committed for the benefit of a criminal street gang. *See* Cal. Penal Code §§ 245(a)(1) and 186.22(b)(1)(B). Barron admitted a prior conviction that qualified as a serious felony and as a strike. On April 27, 2012, Barron was sentenced to 16 years in state prison.

Barron appealed, and the court of appeal affirmed the conviction in an unpublished decision dated November 19, 2009. The California Supreme Court denied review on February 24, 2010. Barron filed the current petition on June 8, 2011.

*United States District Court*
*For the Northern District of California*

**United States District Court**
For the Northern District of California

1   On August 30, 2011, the court issued an order to show cause why a writ of habeas

2   corpus should not issue.  Respondent, Mike Stainer, filed an answer, and Barron filed a

3   traverse.

4   **B.   Factual Background**

5   The following factual summary of the offense is taken directly from the order of the

6   court of appeal affirming the judgment.  Answer, Ex. 6 (*People v. Barron*, No. H031590

7   (Cal. Ct. App. Nov. 19, 2009)).

8       *Overview*

9   On May 16, 2003, a fight broke out on Santa Clara Street in San Jose following a

10  concert at the San Jose Arena that had attracted a number of gang members.  Four law

11  enforcement officers from the San Jose Police Department's gang unit witnessed the fight

12  from their Ford Explorer.  They testified that they saw what they believed to be a stabbing.

13  They identified Barron as the stabber.  Carlos Rivas was identified as the probable victim.

14  Barron and Rivas were members of rival graffiti-tagging crews affiliated with the Norteño

15  street gang.  One year earlier, Barron and two others had been charged and tried in

16  connection with a shooting involving Rivas and his tagging crew; Barron had been

17  acquitted, although the others had been convicted.  The prosecution's theory of the current

18  case posited lingering bad blood between Barron and Rivas as the motive for the stabbing.

19  Rivas and others identified as having been involved in the post-concert fracas variously

20  denied or admitted gang affiliations, bad blood between rival tagging crews, or knowledge

21  of the circumstances surrounding the fight.

22  Barron testified in his own behalf.  He denied possession of a knife and claimed self

23  defense.  Self defense and simple assault instructions were given, but the jury convicted

24  Barron of assault with a deadly weapon for the benefit of a street gang.

25      *The Gang Evidence* [Footnote omitted.]

26  Officer Joe Campagna testified as an expert in the field of "gangs and/or tagging

27  crews."  He defined "graffiti vandalism" as "going out and tagging with . . . spray paint or

28

2

pens in various areas of San Jose."  A tagging crew is a group which commits the crime of graffiti vandalism together.

A regular tagger is a graffiti vandal who will commit vandalism on street poles and signs to get fame among his peers.  Regular taggers will often tag alone.  In contrast, tag bangers "will actually go to somebody's neighborhood as a show of disrespect, ... looking for problems or to show that ... they don't back down to anybody. [T]hey'll cross out people's tags or monikers and put theirs up. [T]hey're more violent. Some of them carry weapons.  [¶] They associate with [Norteño or Sureño] criminal street gangs, . . . whereas regular tagging crews don't associate with any other gangs."  Tag bangers "will wear the color red; they will have the hairstyles of a gang member; they'll hang out with other gang members, not only in their tagging crew but also ... whichever gang they're associating with."  Tag bangers often go out in groups "because they're going out in ... other people's area to do damage.  [T]hey know that most of the time they're going to be confronted by somebody from the opposite or rival gang."

Members of the Norteño or Sureño gangs will also tag graffiti; it is one of the more prolific activities of gang members.  They do it "to show that this is their area, that other gangs aren't . . . allowed to come into their area."

In 2000, there were well over 20 tagging crews in San Jose.  Some crews joined together so that they could cover a wider area with graffiti vandalism.  Some of crews had "evolved into almost like gangs."  TSU, DHT, AOT, and JSP [footnote omitted] were some of the bigger tagging crews in San Jose and over the years they started engaging in assault with a deadly weapon and other violent crimes.  Many assaults between rival tag banger crews are never reported to the police because gang members do not want to come to court, do not want to be labeled as snitches and do fear reprisal from other gang members for talking to the police or a judge.

In Officer Campagna's expert opinion, TSU is associated with the Norteño criminal street gang.  Norteño criminal street gangs are associated with the color red, the number 14, and the letter N, which is the fourteenth letter of the alphabet and also stands for

3

1   Northern Structure or Nuestra Familia.  Campagna also opined that Barron is the leader of

2   TSU and a Norteño gang member.  Barron's original moniker was "Lost" but he later

3   changed it to "Chulo."  Johnny Villafuerte is a cousin of Barron's girlfriend, Christina

4   Villafuerte, and is also a member of TSU.  His moniker is "Deaf."  On February 11, 2002,

5   Villafuerte told Campagna that Barron "allowed" him into the TSU tagging crew and gave

6   him "permission" to start tagging the initials "TSU."

7         It was also Officer Campagna's expert opinion that Efrain Maciel is a member of

8   TSU and a Norteño gang member.  Maciel has admitted that he "associates with Norteño

9   gang members" but not that he is himself a Norteño gang member.  Maciel's moniker is

10  "Arson."

11        Campagna opined that JSP and AOT are tag bangers also associated with the

12  Norteño criminal street gang.  Carlos Rivas is a member of AOT-JSP; his moniker is

13  "Fraze."  Jose Torres is also a member of JSP-AOT; his moniker is "Hoser."

14        Officer Campagna opined that the primary activities of the TSU gang are felony

15  vandalism and assault with a deadly weapon; that members of the TSU gang have

16  individually and collectively engaged in a pattern of criminal gang activity, including the

17  incident on May 16, 2003; and that the benefit that TSU received from the May 2003

18  incident is the reputation of being a strong and violent gang that does not back down.

19        Evidence was introduced about Barron's prior arrests and convictions for graffiti

20  vandalism and about his prior conviction for assault with a deadly weapon, in which Barron

21  stabbed the victim.

22        Officer Campagna investigated a shooting incident that took place on February 25,

23  2002.  Barron and Efrain Maciel were charged with the shooting; Carlos Rivas was one of

24  the victims.  Maciel confessed to the shooting to Campagna.  Maciel said that he was in the

25  area of Sixth and Julian Streets to do graffiti vandalism.  That neighborhood is the territory

26  of the tagging crews JSP, AOT and DHT, which joined together as one gang because each

27  crew had so few members.  Maciel said he was with a juvenile member of TSU, and he

28  implied that Barron was also with him, although he was prevented from naming Barron by

United States District Court
For the Northern District of California

4

United States District Court
For the Northern District of California

the gang's code of conduct and his fear of being labeled a snitch. [Footnote omitted.] Maciel recognized "Fraze" (Carlos Rivas) and "Hoser" (Jose Torres), both members of AOT-JSP.

George Vargas, who is not a member of AOT-JSP, was also present and identified members of TSU as the persons who shot at him.

On March 28, 2002, Campagna and another police officer interviewed Rivas at his parole agent's office about the shooting. They wanted to know if Rivas could identify some individuals involved in a shooting incident. They did not threaten to violate Rivas' parole or otherwise get him in trouble if he failed to cooperate.

Rivas told the police that on February 25, 2002, he and some friends were "hanging out" near Sixth and Julian Streets. Three men walked towards them yelling "TSU." One of the men pulled out a small gun and started firing rounds at them. Rivas did not think it was a real gun, and he started yelling back at the men, who jumped into a waiting car and sped off. Rivas identified Barron's photo from a photo line-up as "the guy he chased down after the initial shots." That same day, police did a probation search of Barron's home and located a red cap with a red "T" on it and a black cap with a "T" on it which indicated to Campagna that Barron was involved in gang activity. Barron was arrested for the shooting that day.

Troy Benson of the district attorney's office prosecuted Barron, Maciel and a juvenile for assault with a deadly weapon in connection with the February 2002 shooting. The juvenile admitted guilt, but Barron and Maciel went to trial. Maciel was convicted, and Barron was acquitted. At trial, Rivas denied anything had happened. Although he had identified Barron to the police, he recanted his identification at trial.

In 2003, Benson also began prosecuting a second case involving Barron and Rivas in which Rivas was the victim of a stabbing. He received phone calls from Rivas in which Rivas said he did not want to testify because he was afraid of retaliation against him and his family by Barron or Barron's gang. These phone calls were recorded and played for the jury.

5

*The Assault on May 16, 2003*

On May 16, 2003, a "bomb concert" was held at the San Jose Arena in downtown San Jose. A "bomb concert" is a large rap concert put on by the radio station Wild 94.6 that attracts large numbers of young adults, including "a lot of gang members." The concert let out right around midnight. Detective Jose Rodriguez and his partner, Stan McFadden, along with a California Youth Authority (CYA) parole agent and a juvenile probation officer, were assigned to monitor the crowd on the "Santa Clara corridor" which runs from the Arena on Santa Clara Street to Highway 101. Typically, after such concerts, the "crowd gets unruly" and "there's always a lot of small scuffles, a lot of gang fights."

On this night, Detective Rodriguez, dressed in civilian clothes, but with his police badge visible on his chest, was driving an unmarked Ford Explorer. McFadden was in the front passenger seat and the parole agent and probation officer were in the back seat. The others were also dressed in civilian clothes. At that time, all four officers were assigned to the gang investigations unit, and it was "common" for gang detectives from the San Jose Police Department to work with juvenile probation officers and CYA parole officers in trying to curb the gang problem.

Detective Rodriguez, heading westbound on Santa Clara Street, stopped at the light at the intersection with North Sixth Street. He saw "anywhere from ten to 15[,] maybe even 20" individuals "hanging out" at the street corner, many of them dressed in red. They started to separate and "square off" against each other. Through the partially open window, he could hear them screaming and yelling. Some were "raising up their arms," as if challenging people to fight. Pedestrians were walking by in both directions and the car traffic was "stop-and-go, bumper to bumper."

Suddenly, rocks, bottles and sticks were flying. "And then just chaos: everybody starting fights everywhere; everybody spilling into the . . . streets; people running down North Sixth Street; people just scattering and . . . fighting all over the place." A couple of groups started fighting in the outside lane of Santa Clara Street near the curb closest to the

United States District Court

For the Northern District of California

1   Explorer.  The Explorer was in the inside lane next to the center median, and there was a

2   vehicle next to the Explorer in the outside lane, next to the curb.

3        Rodriguez testified that he saw Barron, who was standing next to the passenger side

4   of the car beside the Explorer, towards the front of that car, "take something out of his

5   pocket."  It had a "shiny, like, blade" and Rodriguez thought it was like a folding knife.

6   Barron started attacking the person in front of him.  Barron had the knife in his right hand

7   and "lunged" towards the victim.  "He did a couple of slashes.  And then he raised his arm,

8   with a clenched fist, and kind of went over the top . . . of the victim . . . about five times."

9   Detective Rodriguez demonstrated the action by "us[ing] his arm in a slashing motion

10  originally that went from right to left, and then an . . . over-the-shoulder downward stabbing

11  motion."  Barron made contact with the victim's "upper chest, arms area, and the . . . back

12  shoulder areas."  The victim tried to defend himself with his fists, fighting back. Rodriguez

13  believed Barron struck the victim from three to five times.  Some of those strikes were

14  slashes and some were stabs.  The knife was five or six inches long with the blade

15  extended and was less than a quarter-inch wide.

16       Other people jumped in between Barron and the victim and separated them.  Barron

17  took a few steps back, still clenching the knife in his hand.  Barron walked south across

18  Santa Clara Street.  As Barron crossed the street, he walked in front of the Explorer, about

19  10 feet away, and Rodriguez was able to see Barron's face clearly.  Barron walked slowly,

20  still clenching the knife.  He appeared to be looking around in all directions.

21       The officers stayed in their car because they were in civilian clothes and did not

22  have their full gear.  Detective McFadden called for backup immediately.  Detective

23  Rodriguez turned the car around and drove south on Sixth Street, following Barron, who

24  was walking in the middle of Sixth Street towards the Albertson's parking lot.  As Barron

25  entered the parking lot at Sixth Street, Detective Rodriguez drove in behind him.  Two other

26  individuals walked into the parking lot behind Barron.  When it appeared that Barron was

27  starting to walk back towards the scene of the attack, all four officers got out of the

28  Explorer.

United States District Court

For the Northern District of California

1    Detective Rodriguez was the first officer to confront the three individuals.  Rodriguez

2  identified himself as a San Jose police officer and told them to stop and get down on the

3  ground as he displayed his badge with his left hand and pointed his gun at them with his

4  right hand.  Next, Detective McFadden came up with his gun drawn and pointed it at them,

5  followed by parole agent Gloria Ramirez, who also pointed her gun at the men.  Two of the

6  men got down on the ground, but Barron made eye contact with Detective Rodriguez,

7  turned around, and ran into the traffic on Santa Clara Street.  At that moment, Barron was

8  wearing dark gloves and still holding the knife.  As Barron ran, a patrol car came from

9  South Sixth Street to the officers' location.  Rodriguez yelled at the officer in the patrol car

10  to stop Barron.  With lights and siren activated, the patrol car followed Barron.

11    Rodriguez saw the uniformed officer get out of the patrol vehicle and approach

12  Barron.  Barron turned around and started running back to the Albertson's parking lot.

13  Rodriguez had started walking towards Barron and the uniformed officer, and cut off

14  Barron's escape through the parking lot.  Rodriguez again identified himself as a police

15  officer and told Barron to stop.  Barron looped back around and headed towards Santa

16  Clara Street.  When Rodriguez intercepted Barron, he believed Barron still had the knife;

17  Barron had something clenched in his hands.  Rodriguez assumed Barron was still armed,

18  but all he could see was the clenched hands and the gloves; he could not actually see a

19  blade of any sort.

20    Rodriguez gave chase.  Barron hurdled over some foot-high bushes and "somehow

21  stumbled and went headfirst" into one of two round metal posts that supported an

22  Albertson's sign.  Barron "kind of bounced back and fell on the ground there in the dirt

23  corner of that shopping center."

24    At that time, Detective Rodriguez handcuffed Barron.  He did not have a knife on

25  him.  Barron had a big gash on his forehead and was transported to the hospital.  Barron

26  was bleeding from the head.  Photos of Barron's injuries were taken at the hospital.  No

27  knife was ever located.  Detective Rodriguez had never met, contacted, or arrested Barron

28  before this incident.

United States District Court

For the Northern District of California

1    Officer McFadden also saw a fight occurring among a large group of red-clad

2  Hispanic individuals to the right of the Explorer.  Some of the people had hammers and

3  sharp instruments such as knives.  During the course of the fight he observed Barron

4  wearing black gloves, "with what appeared to be a sharp instrument in his hand, shuffling

5  forward in a . . . stabbing manner."  He saw Barron "make contact with somebody," but he

6  did not recall what that person looked like and did not get a good look at the victim.  He

7  described the thing in Barron's hand as "a stabbing instrument" and a "sharp instrument."

8  Barron made multiple movements and made contact with the victim's upper torso and arm

9  areas.  McFadden stressed that he never saw Barron stab someone in the back area or left

10  shoulder area.

11    Barron then crossed the street in front of them, and they followed him in the

12  Explorer.  McFadden and Rodriguez stopped Barron and two others at gunpoint, although

13  he did not recall who the two others were.  McFadden detained the two subjects, believing

14  them to be Barron's associates; meanwhile, Rodriguez chased Barron.  The probation and

15  parole officers stayed with McFadden for crowd control and officer safety.  He knew that

16  subsequently Barron was arrested, and he eventually saw Barron in Rodriguez's custody.

17    Santa Clara County Probation Officer Carmen Hernandez-Murray supervises adult

18  and juvenile probationers with gang affiliations.  Her unit "work[s] closely with San Jose PD,

19  especially with the GIU, the gang investigation unit . . . on a regular basis."  On May 16,

20  2003, she went with police officers Jose Rodriguez and Stan McFadden and parole agent

21  Gloria Ramirez to gather intelligence on gang activity by her probationers after the bomb

22  concert.  She does not carry a gun.  She was riding in the backseat of the Explorer behind

23  McFadden in the front passenger seat.  As they were cruising down Santa Clara Street

24  near the intersection with Sixth Street, her attention was drawn to a "huge" group of males,

25  some wearing red.  At least 20 individuals, white and Hispanic, were involved in an

26  altercation.  She testified: "I saw the Barron with . . . another unknown male.  I don't know

27  who it was.  He [Barron] had something in his hand.  I couldn't tell you if it was a knife or a

28  screwdriver. . . .  I didn't actually see it, but I saw the-the stabbing motion to his back,

United States District Court

For the Northern District of California

1  maybe shoulder blade area."  She felt it was a stabbing object "just because of the motion

2  with his hand.  And I saw something. . . .  There was something that caught my eye."

3  Barron was wearing black gloves.  There were approximately four or five stabbing motions

4  aimed at a specific person.  She saw Barron "lunge" at the victim, and that was when she

5  saw "the [Barron's] hand go out."  She "assumed he was stabbing him, the way it looked."

6  She saw "something shiny in the hand."  She saw "something going in that victim's back

7  and . . . shoulder area."  However, she did not see any blood on his white T-shirt.  She

8  mainly saw his shoulder blade and back area and could not positively identify him.  There

9  was no doubt in her mind that Barron was the assailant.  She recognized Barron from prior

10  contacts.

11        Barron passed in front of the car heading in the direction of the Albertson's store.

12  She could not see a stabbing instrument.  At that point, the officers drove into the

13  Albertson's parking lot.  Rodriguez and McFadden got out with their guns drawn.  "They

14  said, 'Stop. San Jose Police.'"  Barron took off running.  Hernandez-Murray lost sight of

15  Barron when he ran away, and also lost track of Detective Rodriguez when her attention

16  turned to "everything else that was going on."  As she recognized people involved in the

17  fight, she and parole agent Ramirez began "pulling over people."  She did not see Detective

18  Rodriguez take Barron into custody.  Although she stated in her report that Barron "was

19  shortly apprehended by Officer Rodriguez," she learned that information from Detective

20  McFadden.  She hand-wrote her report at the hospital and gave it to Detective Rodriguez.

21  She referred to him by his first name during her testimony because she has weekly

22  meetings with the GIU, and they all go by first names.

23        Hernandez-Murray was one "hundred per cent" sure that she saw Barron stabbing

24  someone.  There is no reason why she would lie for Detective Rodriguez about that, and

25  neither Rodriguez nor McFadden asked her to lie about it.  She would not lie about

26  something like that even if they asked her to do so, because if she were caught lying on a

27  report or in testimony she would lose her job.

28

10

United States District Court

For the Northern District of California

1    Gloria Ramirez is a parole agent with the California Department of Corrections and

2  Rehabilitation, Juvenile Division.  She supervises juveniles who have been released from

3  the Youth Authority to the community on certain conditions, including the condition that they

4  not associate with gang members, or wear gang clothing, or participate in gang offenses or

5  parties.  On May 16, 2003, she went to the bomb concert.  There were a number of

6  Norteños at the concert.  After the concert, she rode in the gang unit's car.  She was sitting

7  in the back seat behind the driver, Rodriguez.  There was a large crowd of people on the

8  sidewalk to her right and she noticed that someone was being assaulted.  She could not tell

9  at this point whether the fight was between Norteños and Sureños.  She did not hear

10  people yelling gang slogans or see gang hand signals.  At first it looked as if "[s]omebody

11  was being hit."  But then she noticed that the assailant's "hand was kind of in a clenched,

12  like he had something in there.  And I could-you could see something, but I didn't know

13  exactly what it was."  "It looked like he was stabbing, making a stabbing motion."  Ramirez

14  could not give a description of what she saw because she could not even remember if it

15  appeared to be metal.  In her report, Ramirez indicated she saw an unknown object in

16  Barron's hand.  The victim was hit "maybe three or four" times in the back and shoulder

17  area.  Ramirez identified Barron as the assailant.  He wore black gloves, a black shirt and

18  jeans.  Later that night, at the hospital, she realized that she knew Barron from juvenile hall,

19  five or six years earlier.

20    She did not see the victim's face and could not identify a photograph of Rivas.  She

21  did not remember what the victim was wearing that night.  She did not see any blood.  She

22  recalled seeing Barron run past the side of the car, but did not remember if she could see

23  anything in his hands at that time.

24    Ramirez recalled that they made a U-turn into the Albertson's parking lot.  Rodriguez

25  got out of the car and said, "Stop. San Jose Police."  Barron kept running and Rodriguez

26  chased after him.  She did not see Rodriguez apprehend Barron.  She did not see Barron

27  again until she saw him at the hospital.  She, Hernandez-Murray, McFadden, and other

28  officers at the scene were busy pulling people over.  In her report, she wrote that Detective

**United States District Court**

For the Northern District of California

1    Rodriguez apprehended Barron after a short chase, but that was based on radio traffic that

2    she heard.

3        At the time, Ramirez had been on "ride-alongs" with the gang unit possibly three

4    times before that night, but not with Rodriguez and McFadden.  She testified that it would

5    not make it more difficult for her to interact with the officers in the gang unit if it were known

6    that she had testified contrary to what gang detectives testified, "if I was telling the truth."

7    She would not lie for a San Jose police officer, and did not interact with Rodriguez or

8    McFadden anymore.  If she were to falsify a police report she would be fired, and she could

9    be prosecuted for perjury and jailed.  She also testified that she did not have any bad

10   feelings about Barron based on her prior interactions with him at juvenile hall.

11       Fifteen or 20 minutes after apprehending Barron, Detective Rodriguez contacted

12   Carlos Rivas, who was sitting in a police car.  At that point, Rodriguez did not recognize

13   Rivas, know him, or know of him from other gang detectives.  He had a cut on his arm and

14   a cut on his eyebrow.  There was also blood dripping from a wound on the top of his head.

15   The injuries to Rivas's arm and head were photographed.  Rodriguez did not believe he

16   asked Rivas to lift his shirt up, and did not recall ever looking at the back of Rivas's shirt to

17   see if it was bloody.

18       Rodriguez informed Rivas that he knew Rivas was on parole and asked him about

19   his involvement in the altercation that had taken place.  Rivas said that he was a passenger

20   in a car that was traveling slowly through traffic when an unknown man approached the car

21   and punched him in the face, causing the gash on the top of his eye.  Rivas got out of the

22   car to defend himself, but everybody started running and scattering.  As he was walking

23   away, he was stopped by a police officer.  Rivas said he could not identify his attackers; it

24   had happened so fast that he wasn't sure.

25       At that time, Rodriguez did not immediately recognize Rivas as the person who had

26   been stabbed by Barron.  He did not know the history between Barron and Rivas, and he

27   believed Rivas's injuries were consistent with his explanation of how he got them.

28   Nevertheless, Rodriguez suspected Rivas had been stabbed by Barron.  Rivas did not

12

United States District Court

For the Northern District of California

1    complain of any injuries other than the wounds to his head and his arm.  Rodriguez

2    informed Rivas that several people had been stopped and he wanted Rivas to look at these

3    individuals to see if he could identify anyone.  Rivas was transported to the same hospital

4    to which Barron had been transported.  Rivas was not treated there.  A field identification

5    was conducted outside the hospital as Barron was in or about the ambulance prior to

6    entering the emergency room.  Rivas did not identify Barron as his attacker.

7    *The Follow-up Investigation*

8         Detective Rodriguez was not involved in the investigation of the 2002 shooting case

9    in which Barron and Maciel were charged.  Officer Campagna was not involved in the initial

10   investigation of the assault on May 16, 2003.  When he learned of it, he told Detective

11   Rodriguez about the rivalry between TSU and AOT-JSP.

12        Rodriguez and Campagna interviewed Efrain Maciel on May 27, 2003.  Maciel said

13   that he and Barron "were just in the wrong place at the wrong time on May 16th, 2003."  As

14   they were pulling out of a parking lot in the area, Maciel heard someone yell out "AOT."  He

15   looked out the car window and saw Carlos Rivas.  Someone threw a metal pipe against the

16   back window of the car.  Barron yelled back "F-AOT. TSU."  He jumped out of the car, and

17   Maciel reluctantly jumped out also to back Barron up.  A large fight broke out among

18   Barron and the individuals who were present.  At one point, Barron picked up a pipe and

19   threw it at the others.  Maciel said that he himself did not throw anything or hit anyone.

20        On June 5, 2003, Detective Rodriguez called Rivas's parole agent and invited her to

21   join him and three other officers in a parole search of Rivas's house.  Rodriguez, his

22   partner, his supervisor, a patrol officer, and the parole agent, Ms. Perez, re-contacted

23   Rivas at his home.  Rodriguez interviewed Rivas for 30 minutes.  He conducted the

24   interview alone and did not tape record it.  Nor did he ask Rivas to sign a statement.  At

25   that time, Rodriguez took a Polaroid photograph of Rivas's back.  The photograph depicts

26   "a scratch or something red" in the center of Rivas's back, in the general area where

27   Rodriguez saw Barron stab someone.  That was the only injury on Rivas' back.

28

United States District Court

For the Northern District of California

1   Detective Rodriguez first testified that Rivas identified Barron as the stabber on June

2   5. Rivas pointed out his injuries and said they were stab wounds. [Footnote omitted.]

3   Rodriguez later explained (on cross-examination) that Rivas "never flat out came out

4   and said, "'Barron stabbed me.'" He said someone else besides Mr. Barron stabbed him.

5   And then he gave a general description of a guy with a knife. . . . Without any names. And

6   then he added all this other information about his background with Mr. Barron and why,

7   even if he was the guy that stabbed him, he was not going to tell us; and that that was our

8   job, to figure out who stabbed him; and that that was all that he was going to come and

9   testify and do what he had to do; and we, the police, . . . had to work with what we had. . . .

10  [H]e felt that if he identified Mr. Barron . . . [he] was going to go through the same process

11  of being identified again as a snitch, putting his family in danger. So at that time he felt that

12  his own safety and his family's safety outweighed him actually admitting to us or telling us

13  that it was Mr. Barron that had . . . stabbed him." Rivas "was willing to go as far as saying

14  [Barron] was there, [Barron] charged at him, but then he said that someone else was the

15  one that did the stabbing."

16  In further testimony, however, Rodriguez testified that Rivas contradicted himself.

17  Sometimes he said it was not Barron, and other times he said he couldn't say it was Barron

18  because he or his family will get hurt.

19  Rodriguez acknowledged that Rivas gave two different versions of what happened;

20  in the first version, Rivas maintained that the fight involved Sureños. He said he was sitting

21  in the car and got struck. He indicated that the injury on his back was an old injury, and

22  that he injured his arm while at work. Rodriguez testified that Rivas's change of story came

23  about in the following way.

24  Rodriguez asked Rivas if he remembered the night of May 16, 2003, and Rivas said

25  he did. Then Rodriguez and Rivas stepped outside of the residence to speak privately.

26  Rodriguez was dressed in civilian clothing. Rodriguez informed Rivas for the first time that

27  Rodriguez was aware of Rivas's history with the tagging crews AOT and JSP; Rivas

28  seemed surprised by that. Rivas at first denied that Barron and Maciel assaulted him. He

14

United States District Court
For the Northern District of California

stated that somebody approached him and attacked him with something that appeared to be some kind of knife.  That person swung at him and cut him above the eye.  He was also cut on his left elbow.  When Rodriguez asked to see his back, Rivas admitted that the scar on his back was also from a blow received the night of the incident.  He said he thought the same suspect slashed at him several times across his body.  He described his assailant as a "Hispanic male, approximately 17 to 20 years old, about 5'10" in height, medium built, medium to dark complexion.  He was clean shaven and was . . . wearing a black sweatshirt and baseball cap."  Rivas then described being stopped by a police officer as he was trying to walk away from the scene, and also talked about being taken to the hospital that night in an attempt to identify someone, but that he failed to identify the person.

Rodriguez asked Rivas if he did not want to identify Barron because he did not want to get involved.  Rivas responded that he did not want to get involved, did not want to mention Barron in any interview because he knew, based on his prior history with Barron, that to do so would put his family in danger.  Rivas pointed out that he had done what he had to do to identify Barron the last time, but that Barron had "beat the case."  He said that Barron "knows I testified against him in court before, and that's why he is still trying to retaliate against me."

Prior to talking with Rivas, Rodriguez had obtained certain information from Rivas's parole agent, Ms. Perez.  Rodriguez confronted him about lying to Ms. Perez.  Rivas responded that he had lied to her because he did not want to get in trouble with her or get his parole violated.  Rivas then said he would tell Rodriguez what he knew, indicating to Rodriguez that his prior statements had been untruthful.

Rivas told Rodriguez that he used to be a member of AOT, but that he had gotten out of AOT after he went to prison.  He admitted that he still hung out with members of AOT and JSP.  On May 16, Rivas had been in the area of Sixth and Santa Clara Streets with some friends, including Jose Torres and at least nine other JSP members.  Rivas saw George Vega, another member of JSP, and got out of his car to talk to him.  As he stood on the street corner chatting, a member of his group yelled out "AOT."  Then someone from a

1   moving car yelled back "F---AOT."  The occupants of the car, Maciel and Barron, got out of

2   the car and confronted them.  A fight ensued in which Rivas was involved.  He recognized

3   Barron and Maciel from prior altercations with them and from court proceedings the

4   previous year.  Rivas said that Barron and Maciel were members of a rival tagging crew,

5   TSU.  He also recognized Barron from jail.  Rivas told Rodriguez that the year before, while

6   he and Barron were both housed in county jail, he learned that Barron had threatened him.

7   Because his life was in danger, Rivas was removed from his cell and placed in protective

8   custody.

9        On June 10, 2003, Campagna interviewed Luis Felix after arresting him on unrelated

10   charges.  Campagna did not promise to let Felix go if he cooperated.  Felix is a JSP gang

11   member who has "JSP tattooed on his stomach" and a very common Norteño tattoo on his

12   face-the number "1" by one eye, and four dots by the other.  He admitted he was present

13   during the May 16, 2003 incident.  Campagna asked him "What's up with your boy 'Fraze'

14   getting stuck," meaning what happened when Carlos Rivas was stabbed.  Felix replied, "If it

15   wasn't for me, he probably would be worse."  He added that when Barron was stabbing

16   Rivas, he (Felix) jumped in and hit Barron, causing the attack to end.  Felix also said that

17   the problems between JSP-AOT and TSU had been going on for years, and that he would

18   not testify in a case against Barron.  Campagna had been asked to subpoena Felix for trial,

19   and Felix had been extremely uncooperative.

20        On August 11, 2004, Rodriguez and Campagna interviewed Rivas a final time at

21   Rivas's parole officer's office in an effort to persuade him to testify against Barron.  At that

22   time, Rivas made statements that "indirectly tied Mr. Barron to . . . being [Rivas's]

23   assailant."  Rivas said he did not want to testify against Barron because he did not want to

24   be labeled a snitch.  He told Campagna that when he and Barron had been in custody

25   together, they had to be separated because Barron had threatened to harm him.  Referring

26   to the May 16, 2003 incident, Campagna told Rivas: "Look what happened downtown last

27   time Barron got out after he beat that case. He came after you."  Rivas responded: "And

28   you saw what happened to him.  They took Anthony away in a stretcher, not me."

United States District Court

For the Northern District of California

Campagna replied, "Anthony still got you a couple times."  Rivas responded, "I got him too."  Rivas indicated he would not admit he had made those statements to Campagna in court.  He also said he knew that Barron would have his boys in court and would come after him if he said anything in court.  When Detective Rodriguez offered to bring him to court and take him home, Rivas responded: "You guys just do your job with the evidence you have, and I'll do what I have to do."  However, Rivas immediately followed up that statement by saying he was no snitch and would not say that in court.  He expressed fear that Barron and his friends would come after him and his family in retaliation.  Rodriguez did not feel that either he or Officer Campagna threatened or put undue pressure on Rivas, nor did they have the ability to violate Rivas's parole.

Carlos Rivas, Efrain Maciel, and Luis Torres were called as hostile witnesses at trial.

Rivas admitted that he became involved in a "tagging crew" called AOT or "Always on Top" when he was 16 or 17 years old and that his tagging moniker was "Fraze."  Rivas suffered three felony and two misdemeanor vandalism convictions in 2002 and one misdemeanor vandalism conviction in 1999 for acts of graffiti.  He denied that he was a Norteño gang member, and denied that his involvement with the crew was gang-related.  His tagging crew did not associate with the color red.  He just happened to be wearing a red shirt in court.  He never heard of a tagging crew called TSU.  He knew Barron from school and was friends with Barron when they were teenagers.  They never stopped being friends; they never had previous altercations and Barron "hasn't done anything for me to dislike him."  He never knew that Barron was part of a crew called TSU or "Tearing Shit Up."  Rivas displayed his tattoos to the jury.  He denied they were gang tattoos.  He denied that his crew had fights with rival crews.  He denied knowing Luis Felix.

On May 16, 2003, he was a passenger in a car driven by his friend Jose Torres that was stopped in traffic on Santa Clara Street.  A group of Sureños began yelling at them and banging on the car.  Through the open car window, one of the people in the group hit him in the eye with something heavy that was in his fist and cut him above the eye.  He got out of the car to defend himself and the Sureños fled.  Rivas denied that he was in a knife fight or

United States District Court

For the Northern District of California

1  was injured with a knife.  The wound on his arm was a work-related scratch from a rose

2  bush.

3       Rivas denied that he ever identified Barron as his attacker to Rodriguez or

4  Campagna; denied telling them he was attacked with a knife; denied that he ever made the

5  statements ascribed to him by Detective Rodriguez and Officer Campagna on June 5,

6  2003, and August 11, 2004; denied that he was afraid of Barron, or afraid of talking to the

7  police, or fearful for his family.  Finally, he denied that Barron and Maciel were involved in

8  the 2002 shooting, and denied that he identified either Barron or Maciel to the police.

9       At the time of trial, Maciel was in Solano State Prison for possession of drugs.  He

10  admitted that he used to be a tagger; his tagger moniker was "Arson."  He knew of a tagger

11  crew called TSU for "Tearing Shit Up" but he was not a part of it.  He denied that he was a

12  gang member.  He grew up with Barron.

13       In February of 2002 he was carrying a .22 caliber Beretta because some people

14  don't like tagging in their neighborhoods.  He was tagging on Sixth and Julian Streets when

15  10 people came out with bats.  He discharged his gun in the air.  Barron was not there.  He

16  would not tell on friends if they were there, because it is dangerous to be a snitch.  Maciel

17  pleaded guilty to two counts of assault with a deadly weapon as a result of that incident.

18       On May 15, 2003 he went to the concert with his girlfriend, Yvonne; Barron and

19  Barron's girlfriend, Christina; and his friend, Lorenzo.  After the concert, Christina drove to

20  the Albertson's on Sixth and Santa Clara Streets where she dropped Lorenzo off.  Maciel

21  was in the back seat and Barron was in the front passenger seat.  Something hit the car,

22  shattering the back window and barely missing him.  He and Barron jumped out to assess

23  the damage and were attacked by 10 to 15 people throwing bottles at them.

24       Maciel testified that Barron did not have a knife when he got out of the car, but

25  acknowledged that he could not see Barron during the fight.  He denied seeing Rivas, but

26  acknowledged that when he was interviewed later, he identified a photo of Rivas and wrote

27  "Fraze from court" on it.  However, he denied that the fight was gang related, and denied

28

United States District Court

For the Northern District of California

1   telling police that the fight was preceded by shouts of AOT or TSU.  He accused the police

2   of lying in their reports about statements he allegedly made to them.

3       Luis Felix denied being a Norteño gang member, although he acknowledged that his

4   facial tattoos were Norteño gang symbols.  He did not remember being in the area of the

5   concert on May 16 or seeing Rivas in a fight that night.  He did not know Barron, or TSU, or

6   Rivas's moniker "Fraze."  He denied telling Campagna that Barron stabbed Rivas or that he

7   stopped the attack.

8   *The Defense Case*

9       Christina Villafuerte is the mother of Barron's son.  She testified that she was driving

10  the car in which Barron and Maciel were riding on May 16, 2003.  After dropping Lorenzo

11  off at the Albertson's parking lot, she continued to Santa Clara Street, where someone

12  threw an object at her rear windshield and shattered it.  She did not hear anyone yell

13  "AOT."  Barron did not yell back, "F----AOT."  A group of 15 guys came towards her car,

14  and Barron and Maciel got out to confront them.  She then made a U-turn and drove away.

15  She testified that Barron does not carry a knife and was not holding one when he got out of

16  the car.

17      Veronica Prado was dating Lorenzo in May of 2003 and is best friends with Yvonne

18  Sanchez, who was dating Maciel.  She was waiting for a ride at the Albertson's lot after the

19  concert when Villafuerte's car cruised by and stopped.  Lorenzo and Maciel got out of the

20  car to talk to the girls, but Maciel got back in to continue cruising.  She heard the glass

21  shatter.  She saw Barron being chased by a police officer who had his gun drawn and told

22  Barron "to freeze."  She saw him run into the Albertson's sign post and fall down

23  unconscious.  He was then arrested.  Prado did not see anything in Barron's hands while

24  he was running.

25      Barron testified in his own behalf.  On May 16, 2003, he was cruising on Santa Clara

26  Street with Maciel, Lorenzo and Christina after the concert.  They saw Veronica and

27  Yvonne, and Lorenzo and Maciel got out of the car to talk to them.  Maciel got back in the

28  car and they continued cruising.

**United States District Court**

For the Northern District of California

1    Christina's car was stuck in traffic on Santa Clara Street when suddenly something

2    shattered the rear windshield.  Barron and Maciel got out of the car and were confronted by

3    15 guys who started fighting with them.  He was punched by six or seven of the men and

4    fought back with his fists.  He was being hit over the head with bottles, so he put his head

5    down and punched someone several times with his right hand while grabbing someone

6    with his left.  When he realized he was bleeding from the back of the head, he broke away

7    from the fight and ran towards the parking lot.  Barron received seven stitches and has a

8    scar on his head from being hit with bottles; he also received stitches for other injuries he

9    received that night.  Barron denied that he had a weapon, or stabbed anyone, or assaulted

10   anyone with a weapon that night.

11   Barron noticed a car driving slowly into the Albertson's parking lot and saw that the

12   driver was watching him.  He did not know that the driver, Rodriguez, was a police officer,

13   and never he heard him identify himself as a police officer.  He thought Rodriguez was part

14   of the group that had attacked him, and so he ran from him across Santa Clara Street.  But

15   when he saw a group of people pointing at him and coming towards him, he ran back

16   towards Albertson's, where he again saw Rodriguez.  When Rodriguez ran towards him,

17   Barron became afraid and ran from him.  He ran into the Albertson's sign and was arrested

18   while he was on the ground, still dazed and semiconscious from hitting the pole.  At that

19   point, he told a uniformed officer that he had been attacked.  He was taken to the hospital

20   by ambulance a few minutes later.  At the hospital, he told McFadden that he did not stab

21   anyone.

22   Barron denied that anyone yelled "AOT" or "F---AOT, TSU" before the fight.  He

23   denied that he was the leader of TSU and testified that he had left TSU in 2001.  He

24   acknowledged that Rivas was in AOT but denied that AOT and TSU were rival gangs.  He

25   claimed that he and Rivas were friends.  He denied that Rivas was one of the men who

26   attacked him on May 16, 2003.

27

28

United States District Court
For the Northern District of California

1    Barron also denied any involvement in the 2002 shooting incident.  He denied

2  making or passing along threats to Rivas on account of his testimony in the 2002 or 2003

3  cases.

4    Defense investigator Shirley Bernal testified that she interviewed Rivas on May 13,

5  2004. He admitted to her that he had been stabbed on May 16, 2003, but said he did not

6  know who the stabbed him.  Rivas also told her that he feared Barron might retaliate

7  against him for having identified him in connection with the 2002 shooting incident.

8                                   **ISSUES**

9    Barron raises the following claims for habeas relief:

10    (1) his due process and Confrontation Clause rights were violated by the trial court's

11  exclusion of evidence that an officer used excessive force against him;

12    (2) the prosecutor committed misconduct in specified ways; and

13    (3) the cumulative effect of the above errors prejudiced him.

14                                  **ANALYSIS**

15  **I.    Standard of Review**

16    A district court may not grant a petition challenging a state conviction or sentence on

17  the basis of a claim that was reviewed on the merits in state court unless the state court's

18  adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

19  unreasonable application of, clearly established Federal law, as determined by the

20  Supreme Court of the United States; or (2) resulted in a decision that was based on an

21  unreasonable determination of the facts in light of the evidence presented in the State court

22  proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

23  mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09, (2000),

24  while the second prong applies to decisions based on factual determinations, *Miller-El v.*

25  *Cockrell*, 537 U.S. 322, 340 (2003).

26    A state court decision is "contrary to" Supreme Court authority, that is, falls under

27  the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to

28  that reached by [the Supreme] Court on a question of law or if the state court decides a

1   case differently than [the Supreme] Court has on a set of materially indistinguishable facts."

2   *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application

3   of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly

4   identifies the governing legal principle from the Supreme Court's decisions but

5   "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The

6   federal court on habeas review may not issue the writ "simply because that court concludes

7   in its independent judgment that the relevant state-court decision applied clearly

8   established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must

9   be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

10       A state court's determination that a claim lacks merit precludes federal habeas relief

11   so long as "fairminded jurists could disagree" on the correctness of the state court's

12   decision.  *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (citing *Yarborough v.*

13   *Alvarado*, 541 U.S. 652, 664 (2004)).  "[E]valuating whether a rule application [i]s

14   unreasonable requires considering the rule's specificity.  The more general the rule, the

15   more leeway courts have in reaching outcomes in case-by-case determinations."  *Id.*  "As a

16   condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must

17   show that the state court's ruling on the claim being presented in federal court was so

18   lacking in justification that there was an error well understood and comprehended in

19   existing law beyond any possibility for fairminded disagreement."  *Id.*

20       Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

21   determination will not be overturned on factual grounds unless objectively unreasonable in

22   light of the evidence presented in the state-court proceeding."  *Miller-El*, 537 U.S. at 340.

23   Review under § 2254(d)(1) is limited to the record that was before the state court that

24   adjudicated the claim on the merits.  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

25   **II.**       **Confrontation Clause Claim**

26       Barron seeks habeas relief on the ground that the trial court's exclusion of evidence

27   of misconduct to impeach Detective Rodriguez violated his right to due process and the

28   right to confrontation.

United States District Court
For the Northern District of California

1

**A.    Legal Standard**

2       The Confrontation Clause of the Sixth Amendment guarantees a defendant in a

3  criminal case an opportunity for effective cross-examination of the witnesses against him.

4  *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974); *Murdoch v. Castro*, 609 F.3d 983, 989 (9th

5  Cir. 2010) (en banc), *cert. denied*, 131 S. Ct. 2442, *reh'g denied*, 132 S. Ct. 47 (2011).

6       "A criminal defendant can prove a violation of his Sixth Amendment rights by

7  'showing that he was prohibited from engaging in otherwise appropriate cross-examination

8  designed to show a prototypical form of bias on the part of the witness, and thereby to

9  expose to the jury the facts from which jurors . . . could appropriately draw inferences

10 relating to the reliability of the witness.'" *Holley v. Yarborough*, 568 F.3d 1091, 1098 (9th

11 Cir. 2009) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)) (internal quotation

12 marks omitted).  "However, 'it does not follow, of course, that the Confrontation Clause of

13 the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's

14 inquiry into the potential bias of a prosecution witness.'" *Id.* (quoting *Van Arsdall*, 475 U.S.

15 at 679).  "On the contrary, the right to cross-examination may, in appropriate cases, bow to

16 accommodate other legitimate interests in the criminal trial process." *Id.* (citations and

17 quotation marks omitted).  As the Supreme Court recognized in *Van Arsdall*, "trial judges

18 retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable

19 limits on such cross-examination based on concerns about, among other things,

20 harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is

21 repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679.  "Any such 'restrictions

22 on a criminal defendant's rights to confront adverse witnesses,' however, 'may not be

23 arbitrary or disproportionate to the purposes they are designed to serve.'" *Ortiz v. Yates*, –

24 F.3d —, 2012 WL 6052251 (9th Cir. Dec. 6, 2012) (quoting *Michigan v. Lucas*, 500 U.S.

25 145, 151 (1991)) (internal citation and quotation marks omitted).

26       To determine whether the trial court's restriction on a defendant's ability to

27 cross-examine an adverse witness violates the Sixth Amendment right of confrontation

28 under *Lucas*, the court must make a two-part inquiry.  *Ortiz*, 2012 WL 6052251 at *7 (citing

*Fowler v. Sacramento Co. Sheriff's Dept.*, 421 F.3d 1027, 1038 (9th Cir. 2005)).  "First, we ask 'whether the proffered cross-examination sufficiently bore upon the witness' reliability or credibility such that a jury might reasonably have questioned it.'"  *Id.*  If the first element is satisfied, the court must then consider "'whether the trial court's preclusion of this cross examination was unreasonable, arbitrary or disproportionate' in light of any 'countervailing interests' justifying preclusion, such as 'waste of time, confusion and prejudice.'"  *Id.* (quoting *Fowler*, 421 F.3d at 1038, 1040).

Even where a violation of the Confrontation Clause is found, the court must assess whether the error had prejudicial impact under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).  *Merolillo v. Yates*, 663 F.3d 444, 455 (9th Cir. 2011), *cert. denied,* 133 S. Ct. 102 (2012).  Under harmless error analysis, "[h]abeas relief is warranted only if the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'"  *Id.* (quoting *Brecht*, 507 U.S. at 637–38).  To determine whether a violation of the Confrontation Clause had "substantial and injurious effect," the court applies the five non-exclusive factors set forth in *Van Arsdall*: (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case.  *Id.* (citing *Van Arsdall*, 475 U.S. at 679).

**B.     Trial Record**

With respect to Barron's Confrontation Clause claim, the court of appeal summarized the relevant trial court record as follows.  Answer, Ex. 6 at 24-26.

Prior to trial, defense counsel sought to introduce undisputed evidence that in the process of arresting defendant, Detective Rodriguez "kicked [defendant] three times after he ran into the signpost and was on the ground."  [Footnote: Detective Rodriguez admitted he had done so in his police report.]  According to the prosecutor, after defendant fell to the ground upon hitting a pole, "he has his hands underneath him.  When the officers make contact with him, they're ordering him repeatedly to remove his hands from underneath

United States District Court

For the Northern District of California

him. He does not do that. And then he is kicked several times. [¶] The defendant . . . has no injuries . . . where he allegedly was kicked." Rodriguez's supervisor, Sergeant Wilson, interviewed defendant that night about the kicking and recorded defendant's statement.

The defense argued that the evidence of Detective Rodriguez's misconduct was relevant to show that Rodriguez had a motive to lie about seeing defendant stab another person with a knife. The defense theory was that Rodriguez claimed, untruthfully, that he saw defendant stab someone with a knife in order to be able to justify the kicking as reasonable in light of his stated belief that defendant was armed with a knife when he was arrested. As the prosecutor put it: "The argument is absolutely that Officer Rodriguez is lying to cover his own butt for then kicking the defendant subsequent to this altercation." The defense argued that the physical evidence did not support a stabbing: no knife was found, the victim denied that he was stabbed, and he did not have any stab wounds to his back.

The court observed that there were "three or four other witnesses who say that he was stabbed." Defense counsel responded: "[I]f the jurors want to accept the testimony of the other three witnesses, fine. But I don't believe that the defense should be hampered in its attempt to discredit at least one of those officers. [¶] And that is the principal officer in this case. This officer contacted the victim subsequent to that night. This officer is . . . going to be testifying with regards to the gang allegations. He's going to be sitting here throughout the trial. He is going to be the witness that I believe the jurors will be looking to . . . principally in terms of making their decision. If I can discredit him, then I think it calls into question the credibility of his partner officer, McFadden" because "they work together, they're both undercover."

The prosecutor argued that the evidence was not relevant under Evidence Code section 352 because "four independent law enforcement personnel . . . all say, independently, that they witnessed Mr. Barron stabbing somebody. [¶] Given that, it is not very likely that Officer Rodriguez is lying about what he saw in order to protect himself from the fact that he had to kick Mr. Barron."

United States District Court

For the Northern District of California

1   The trial court ruled: "I don't think it's relevant if the testimony comes out the way I'm

2   hearing it's going to come out.  [But] if the witnesses don't testify that they all saw the

3   defendant with a knife, then I will change my ruling, and I may consider it to be relevant

4   what this witness says. . . .  If people saw the defendant with a knife, then I don't think what

5   happened afterwards, in terms of the officer's response to it, is improper.  And therefore, I

6   think it's really just trying to inflame the jury with the fact that the officer kicked the

7   defendant.  [¶]  However, if these other witnesses, three other independent witnesses, don't

8   say they saw defendant with a knife, then I would, of course, let this in, because I think it

9   goes to the credibility of the one witness who indicates the defendant had a knife. . . .  So I

10  think the prejudice of this testimony coming in outweighs the probative, based on the offers

11  of proof . . . that I've heard about what the testimony is going to be."

12  After the four officers had testified about the altercation, the defense moved for

13  reconsideration of the court's initial ruling.  The court inquired of defense counsel "how the

14  kicking shows bias."  Defense counsel explained that "The motive is that he doesn't want

15  Mr. Barron to be in a situation where he could potentially file a suit against him down the

16  road, if Mr. Barron chose to do that."  When the court inquired about the statute of

17  limitations, counsel further explained that defendant did not file a citizen complaint

18  immediately.  Because he was on parole, "he was whisked away to state prison on a

19  violation."  He served one year on the violation.  When he returned from state prison, he

20  attempted to file a complaint but was told the statute of limitations had run.

21  The court ruled: "I don't think the probative value of this evidence is . . . there.  I don't

22  think it logically and reasonably . . . leads to the conclusion that the witness has a . . .

23  motive to lie.  I just don't think the dots connect up with the reason that I'm given as the

24  motivation here.  [¶]  The prejudicial evidence under 352 is not evidence that would

25  naturally flow from highly relevant probative evidence.  It's that prejudice which would

26  cause a person to make a decision based on an extraneous factor.  And I . . . think that this

27  evidence that the defense is seeking to get in is that kind of evidence.  So I am going to

28  deny their request."

**C.     Discussion**

In the "last reasoned state-court opinion" for purposes of habeas review under § 2254(d), *Ortiz*, 2012 WL 6052251 at *8, the court of appeal determined that the exclusion of evidence that Detective Rodriguez kicked Barron several times while he lay semiconscious on the ground was a violation of the Sixth Amendment right to cross-examine a witness, but that the error was harmless beyond a reasonable doubt.  Answer, Ex. 6 at 34 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).  The court of appeal found that the evidence that Rodriguez admitted that he kicked Barron while arresting him would have tended to show both a reason to fabricate the existence of a knife and a willingness to lie.  *Id.* at 31-32.  The court of appeal determined that the trial court violated Barron's right to confront the witness by prohibiting all cross-examination on this point.  *Id.* at 32-33.  The state court further determined that the Sixth Amendment violation was harmless error, reasoning as follows:

> In our view, "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defendant's] counsel been permitted to pursue his proposed line of cross-examination." *(Van Arsdall, supra*, 475 U.S. at p. 680.) However, we must nevertheless assess whether the error requires reversal. (*Chapman v. California, supra*, 386 U.S. at p. 24; *Van Arsdall, supra*, 475 U.S. at p. 684 [*Chapman* standard applies to restriction of cross-examination to expose bias] .) "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (*Van Arsdall, supra*, 475 U.S. at p. 684.)

> Applying this analytical framework to the facts before us, we first note that through cross-examination of the civilian witnesses such as Maciel and Rivas, defense counsel was able to draw out the accusation that Rodriguez and Campagna had lied in their reports about statements the witnesses had allegedly made to them. Through cross-examination, defense counsel was also able to force Detective Rodriguez to explain the full circumstances of his interview with Carlos Rivas and expose the inconsistencies among Detective Rodriguez's various versions of that exchange. And, through cross-examination of

1    the three other law enforcement witnesses, defense counsel was also
     able to bring out the differences between the four officers'
2    observations of the assault.

3          It is true that Rodriguez was a key witness, but he was not the
     only witness to the assault. Although each officer's description of the
4    fight differed in some respects, in the end Officers McFadden,
     Hernandez-Murray, and Ramirez all agreed they saw something in
5    defendant's hands as he made stabbing motions towards the victim. If
     Carlos Rivas's wounds did not tally perfectly with all of the slashing
6    motions described by witnesses, they were nevertheless consistent
     with his admissions that he had been stabbed during a fight.
7    Furthermore, on August 11, 2004, Rivas made admissions to Officer
     Campagna, as well as to Detective Rodriguez, that suggested he
8    had been stabbed by defendant. Luis Felix also admitted to Officer
     Campagna that defendant stabbed Rivas with a knife. The civilian
9    witnesses who testified were plainly hostile to the proceedings and
     were impeached with their prior statements to police. Finally, evidence
10   concerning the 2002 shooting and subsequent trial provided
     powerful evidence of motive for the current assault. In short, aside
11   from Detective Rodriguez's testimony, the case against defendant
     was strong, and there was ample evidence that defendant stabbed
12   Rivas. Under these circumstances, the trial court's error in excluding
     evidence that Detective Rodriguez kicked defendant three times while
13   arresting him was harmless beyond a reasonable doubt. (*Chapman v.
     California, supra*, 386 U.S. at p. 24.)
14

15   Answer, Ex. 6 at 33-34.

16          Barron does not dispute the court of appeal's determination that the trial court's

17   exclusion of evidence of Detective Rodriguez's use of force impaired Barron's right to

18   cross-examine a key adverse witness, but contends that the state court's harmless error

19   analysis was an unreasonable application of clearly established federal law.

20          The court of appeal, on direct review of the criminal judgment, applied the *Chapman*

21   standard for harmless error, which holds that "constitutional error can be considered

22   harmless only if a court is 'able to declare a belief that it was harmless beyond a

23   reasonable doubt.'" *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Chapman*, 386 U.S. at

24   24).  On habeas review, however, the court "must assess the prejudicial impact of

25   constitutional error in a state-court criminal trial under the 'substantial and injurious effect'

26   standard set forth in *Brecht*, [ ] whether or not the state appellate court recognized the error

27   and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard

28   set forth in *Chapman*." *Id.* at 121-22.  Under the *Brecht* standard, "'[i]f a habeas court is left

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   with "grave doubt" about whether a constitutional error substantially influenced the verdict,

2   then the error was not harmless.'"  *Ortiz*, 2012 WL 6052251 at *10 (quoting *Parle v.*

3   *Runnels*, 387 F.3d 1030, 1044 (9th Cir. 2004)).

4          Looking to the *Van Arsdall* factors to determine whether the trial court's error had a

5   "substantial and injurious effect or influence in determining the jury's verdict," the court

6   concludes that the restriction on Barron's ability to cross-examine Detective Rodriguez was

7   harmless error.  First, Rodriguez's testimony was important in the prosecution's case, but

8   he was not the only witness to the assault.  Three other officers testified to seeing Barron

9   making stabbing motions toward another person, and each testified to seeing something in

10  Barron's hands.  During the course of the group fight, Officer McFadden saw a "sharp

11  instrument in [Barron's] hand, shuffling forward in a – in a stabbing manner."  10 RT 751.[1]

12  Probation Officer Hernandez-Murray testified that Barron "had something in his hand.  I

13  couldn't tell you if it was a knife or a screwdriver. . . . I didn't actually see it, but I saw the –

14  the stabbing motion to his back, maybe shoulder blade area."  8 RT 308.  Parole Agent

15  Ramirez, from the Juvenile Division of the California Department of Corrections and

16  Rehabilitation, testified that she saw Barron making a "stabbing motion" and that Barron's

17  "hand was kind of in a clenched, like he had something in there.  And I could – you could

18  see something, but I didn't know exactly what it was."  8 RT 372.

19         Second, Rodriguez's testimony was not cumulative, in light of the record which

20  indicates that "not one other officer testified unequivocally that he or she saw defendant

21  wield a knife, even though all were sitting in the same car," as the court of appeal noted.

22  Answer, Ex. 6 at 29-30.  Further, no other officer testified that he or she saw Barron's arrest

23  by Rodriguez.

24         Third, other evidence presented at trial corroborated Rodriguez's testimony that he

25  saw Barron stab the victim, including the testimony of Officer McFadden, Probation Officer

26  Hernandez-Murray and Parole Agent Ramirez seeing Barron holding some kind of object in

27  ───────────────

28       [1]        Respondent has lodged the Reporter's Transcript of the trial court proceedings
    as Exhibit 1 to the Answer.

United States District Court
For the Northern District of California

1    his hand while making a stabbing motion.  At an interview of the victim about twenty days

2    after the assault, Rodriguez took a Polaroid photograph of the victim's back, showing a

3    wound in the general area of where Rodriguez saw a person being stabbed by Barron

4    during the night of the assault, which was admitted into evidence.  7 RT 212-13, 223.

5    Further, Officer Campagna testified that Luis Felix, a friend of the victim, stated that Barron

6    stabbed the victim and that Felix claimed to hit Barron to stop the attack on the victim.  12

7    RT 1258-60.  Officer Campagna also testified that the victim made statements during an

8    interview with Campagna and Rodriguez indicating that Barron stabbed him, corroborating

9    Rodriguez's testimony about the victim's statements.  11 RT 1071-72; 12 RT 1262.

10        Fourth, Rodriguez was subject to extensive cross-examination and impeachment.

11    As the court of appeal noted, during cross-examination of the civilian witnesses, including

12    the victim, defense counsel drew out their accusations that Rodriguez and Campagna had

13    lied in their reports about the witnesses' statements.  *See* 9 RT 546, 550-53; 10 RT 737-38;

14    10 RT 788-90.  The victim also testified that he felt harassed by Rodriguez into getting him

15    to testify that Barron had stabbed him.  8 RT 468.  Furthermore, on cross-examination,

16    Rodriguez was required to explain the circumstances of his interview with the victim and to

17    expose the inconsistencies in his different versions of that interview.  *See* 7 RT 214-19,

18    263-64.

19        Finally, considering the overall strength of the prosecution's case, and assuming that

20    the damaging potential of the precluded cross-examination would have been fully realized,

21    the exclusion of evidence that Rodriguez admitted to kicking Barron while arresting him did

22    not have a substantial and injurious effect on the outcome of the trial.  In addition to the

23    testimony of three other officers about the assault, the prosecution introduced evidence of

24    motive for the assault on the stabbing victim, namely, the February 2002 shooting incident

25    in which the victim had identified Barron to police.  Barron was charged with the shooting

26    but was acquitted after the victim recanted his identification at trial.

27        Barron argues that exclusion of the proffered impeachment evidence was not

28    harmless because the jury would have believed the civilian witnesses, namely, the stabbing

victim who "testified that he was not a victim," and the corroborating civilian witnesses who "alleged the police pressured them to testify against Mr. Barron and attributed statements to them that they did not make."  Traverse at 11.  Barron further argues that impeaching Detective Rodriguez would also have impeached the other officers.  *Id.* at 9.  In light of the evidence in the record, however, evidence that Rodriguez had kicked Barron during the arrest would not have had a substantial influence on the jury's credibility determinations of the civilian witnesses, who had given statements to Officer Campagna as well as Rodriguez.  Nor would the proffered impeachment evidence have substantially influenced the credibility determinations of the three other officers who testified that they saw Barron with an object in his hand and making stabbing motions during the assault.  Even if Detective Rodriguez's testimony had been rendered non-credible by his admission that he kicked Barron on the ground, there was no evidence from which the jury would infer that the other three officers were lying to protect Rodriguez, particularly in light of the testimony by Probation Officer Hernandez-Murray and Agent Ramirez that they would be subject to reprimand and/or perjury charges if they falsified their reports.  8 RT 360, 413-14. Furthermore, the circumstances of the arrest were not relevant to Barron's motive for stabbing the victim, nor to the civilian witnesses' reasons for recanting their earlier statements expressing fear of retaliation for testifying or being labeled a snitch.  *See* 8 RT 468-69; 13 RT 1592-93.

Having balanced the *Van Arsdall* factors, in light of the strong evidence in the record of guilt, the court agrees with the court of appeal that the preclusion of the proffered impeachment evidence of Detective Rodriguez violated Barron's confrontation rights, and further agrees that the error was harmless.  The state court's determination that the Sixth Amendment violation was harmless error was neither contrary to, nor an unreasonable application or, clearly established federal law.  This claim for habeas relief is therefore DENIED.

**United States District Court**

For the Northern District of California

1   III.    **Prosecutorial Misconduct**

2          A.    **Legal Standard**

3          Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate

4   standard of review is the narrow one of due process and not the broad exercise of

5   supervisory power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due

6   process rights are violated when a prosecutor's misconduct renders a trial "fundamentally

7   unfair."  *Id.; Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process

8   analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

9   culpability of the prosecutor").  Under *Darden*, the first issue is whether the prosecutor's

10  remarks were improper; if so, the next question is whether such conduct "'so infected the

11  trial with unfairness as to make the resulting conviction a denial of due process.'"  *Tan v.*

12  *Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005) (quoting *Darden*, 477 U.S. at 181).

13         A prosecutor may not vouch for the credibility of a witness.  *United States v.*

14  *Moreland*, 604 F.3d 1058, 1066 (9th Cir. 2010); *United States v. Lopez*, 803 F.2d 969, 973

15  (9th Cir. 1986).  Improper vouching for the credibility of a witness occurs when the

16  prosecutor places the prestige of the government behind the witness or suggests that

17  information not presented to the jury supports the witness's testimony.  *United States v.*

18  *Young*, 470 U.S. 1, 7 n.3, 11-12 (1985); *Johnson v. Sublett,* 63 F.3d 926, 930 (9th Cir.

19  1995) (prosecutor's endorsement of witness to jury improper vouching, but did not have

20  substantial impact on verdict necessary to establish reversible constitutional error).

21  Improper vouching includes a broad range of circumstances such as expressing an opinion

22  of the defendant's guilt, denigrating the defense as a sham, implicitly vouching for a

23  witness's credibility, or vouching for his or her own credibility.  *United States v. Wright*, 625

24  F.3d 583, 610 (9th Cir. 2010) (citing *United States v. Hermanek,* 289 F.3d 1076, 1098 (9th

25  Cir. 2002)).  The inherent danger of vouching is that "the prosecutor's opinion carries with it

26  the imprimatur of the Government and may induce the jury to trust the Government's

27  judgment rather than its own view of the evidence."  *United States v. Weatherspoon*, 410

28  F.3d 1142, 1148 (9th Cir. 2005) (quoting *Young*, 470 U.S. at 18–19).

United States District Court

For the Northern District of California

**B.     Discussion**

Barron contends that the prosecutor committed misconduct in closing argument by vouching for the credibility of police witnesses and suggesting that the officers had no reason to lie, and by mischaracterizing the evidence by arguing that Barron could have gotten rid of the knife before he was arrested.

As a threshold matter, respondent argues that Barron forfeited the prosecutorial misconduct claim because he failed to object to the closing argument.  Answer at 33. Respondent concedes, however, that the state court addressed and rejected this claim on the merits.  *Id.* at 33-34.  Because the state court considered the prosecutorial misconduct claim on the merits, procedural default does not bar habeas review and the court may reach the merits of the claim.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) ("If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal court review that might otherwise have been available.").

**1.     Vouching**

Barron challenges the following statements made by the prosecutor in closing argument:

> Now, do I think [Officer Campagna's] been on a three-and-a-half year vendetta against the defendant? No.

14 RT 1872.

> What I can tell you, though, is that Officer Rodriguez has never come into contact with Mr. Barron before that night. And Gloria [Ramirez] and Carmen [Hernandez-Murray] knew him when he was in juvenile hall, and it appears that they were on a friendly -- on friendly terms with him. They never had any prior bad blood with him. And Stan McFadden had never seen him before that night.

> So here are four individuals with no bias or motive to lie about what they saw.  None whatsoever. They saw the defendant stabbing someone.  End of story.  They don't have any reason to make that up.

> So the fact that the defense attorney is making a big deal out of his prior contact with Officer Campagna has nothing to do with four other officers seeing the defendant stab somebody May 16th, 2003.

14 RT 1872.

33

1          [D]efendant's seen by no less than four people with no motive to lie.

2    14 RT 1881.

3          The officers' testimony. Why would these officers get together
     and falsely accuse the defendant? Have you heard any rational
4    reason why a probation officer, a parole officer, who don't hang out
     with these two San Jose officers, and then two San Jose officers
5    would get together and, out of all this group of people, pick out the
     defendant and decide to falsely accuse him for a stabbing he didn't
6    commit? What rational basis would you have for believing that? They
     have no reason for fabrication.

7
     14 RT 1900.
8
          Now, while the defense attorney criticizes the People's case,
9    criticizes all of the witnesses, he then stands up in the end and says
     to you, "You don't have to find that these people are lying." Because
10   he doesn't -- he wants it to appear to you that you can buy the
     defendant's story and acquit him and also say that the officers didn't
11   lie.

12        But that's actually not the case, ladies and gentlemen. You will
     have to find that these officers lied, that they conspired together to
13   come up with a false accusation. Each one of the witnesses,
     including Gloria Ramirez and Carmen Hernandez, who are probation
14   officers and parole officers, they don't work day in and day out with
     San Jose PD. You would have to believe that when they looked
15   across the room and pointed at that man and said, "I saw him -- I'm a
     hundred percent sure -- stabbing somebody that night. And I wrote a
16   report about it," you would have to find that they were lying.

17        There was nothing in their testimony where they were, like, "I
     think it was him. I'm pretty sure it was him." They said, "I definitively
18   can tell you that's what I saw."

19        So what the defense is asking you to believe is that these
     individuals, for no real reason, got together and decided to frame
20   somebody. And in doing so, Detective Rodriguez and Detective
     Campagna then came in and fabricated witness statements; they
21   fabricated Mr. Maciel's statement; they fabricated Luis Felix's
     statement; and they fabricated a number of statements by Mr. Rivas;
22   and they came in here and lied about those statements, because
     those statements are admissions of what happened that night.
23   What they are asking you to do is find that these officers are liars and
     that they conspired to frame an innocent person. And that is not what
24   happened here, folks. While, yes, there have been problems in this
     case, admittedly, this is a strong case as far as that assault with a
25   deadly weapon.

26   14 RT 1961-62 (rebuttal).

27        The court of appeal held that the prosecutor had committed improper vouching only

28   in the statement regarding the veracity of Campagna's testimony, and that this error did not

United States District Court
For the Northern District of California

1  result in denial of due process.  Answer, Ex. 6 at 35-36.  Barron argues, however, that this

2  entire series of statements, taken together, allowed the prosecutor to argue that there was

3  no evidence of bias on the part of the officers, after successfully seeking to exclude such

4  evidence of bias.  Barron contends that because the prosecutor knew that Barron had

5  evidence that could lead the jury to believe that the officers were not being truthful and then

6  argued that no such evidence existed, the prosecutor vouched for the witnesses by

7  misrepresenting that no impeachment evidence existed.  Traverse at 16.

8          To warrant habeas relief, prosecutorial vouching must so infect the trial with

9  unfairness as to make the resulting conviction a denial of due process.  *Davis v. Woodford*,

10  384 F.3d 628, 644 (9th Cir. 2004) (citing *Darden*, 477 U.S. at 181).  "Analysis of a claim of

11  prosecutorial misconduct focuses on its asserted impropriety and substantial prejudicial

12  effect."  *United States v. Weatherspoon*, 410 F.3d 1142, 1145 (9th Cir. 2005) (citation

13  omitted).  "To determine whether the prosecutor's misconduct affected the jury's verdict, we

14  look first to the substance of a curative instruction."  *Weatherspoon*, 410 F.3d at 1151

15  (quoting *Kerr*, 981 F.2d at 1053)).  Another important factor contributing to the prejudicial

16  effect of misconduct is the strength of the case against the defendant.  "When the case is

17  particularly strong, the likelihood that prosecutorial misconduct will affect the defendant's

18  substantial rights is lessened because the jury's deliberations are less apt to be influenced.

19  But as the case becomes progressively weaker, the possibility of prejudicial effect grows

20  correspondingly."  *Id.*  "Moreover, the possibility of prejudicial effect stemming from

21  vouching is increased in cases where credibility is of particular importance."  *Id.*

22                          **a.    Campagna's Credibility**

23          As the court of appeal found, the prosecutor improperly vouched for Officer

24  Campagna's credibility by giving his personal opinion that Campagna, who had

25  investigated the 2002 shooting for which Barron had been charged and later acquitted, has

26  not been on a "three-and-a-half year vendetta against the defendant."  *See United States v.

27  Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) ("A prosecutor has no business telling the jury

28  his individual impressions of the evidence.  Because he is the sovereign's representative,

35

United States District Court

For the Northern District of California

the jury may be misled into thinking his conclusions have been validated by the government's investigatory apparatus."). This was a brief commentary on Campagna's credibility, which was cured by the trial court's instruction to the jury that "[n]othing that the attorneys say is evidence," and "[y]ou alone must judge the credibility or believability of the witnesses." 14 RT 1814, 1817. *See Wright*, 625 F.3d at 613 (prosecutor's misconduct was mitigated by the court's general jury instructions).

### b.    Rodriguez's Credibility

The prosecutor's statements that the officers who testified at trial had "no motive to lie," to suggest that they had impeccable credibility, amounts to improper conduct as to Rodriguez, in light of the prosecutor's knowledge that Rodriguez had admitted to kicking Barron during the arrest. The prosecutor's argument was not based on extra-record facts or a personal assurance of Rodriguez's credibility, and does not strictly amount to vouching. But when a prosecutor asks the jury to draw an inference about a prosecution witness's believability from facts he "knows to be false, or has very strong reason to doubt," such argument runs afoul of the bounds of fair advocacy and constitutes improper conduct. *See United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002).

When examined in the context of the entire proceeding, however, this argument about Rodriguez's credibility did not render the trial fundamentally unfair. As noted by the court of appeal, the verdict was supported by the testimony of three other law enforcement officers about seeing something in Barron's hand as he made stabbing motions. Answer, Ex. 6 at 34. Further, although Barron contends that Rodriguez's admission that he kicked Barron would impeach Rodriguez by providing evidence of a motive to lie about seeing Barron holding a knife, a jury may otherwise reasonably infer that Rodriguez was credible in light of the evidence that he admitted to kicking Barron in his own report, documenting his own misconduct. Answer, Ex. 2 at 1 CT 159. Based "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial a due process,'" the court

1    determines that the prosecutor's misconduct was harmless error.  *Johnson v. Sublett*, 63

2    F.3d 926, 929 (9th Cir. 1995) (citation omitted).

3                            **c.      Other Officers' Credibility**

4          The prosecutor's closing arguments regarding the credibility of the other three law

5    enforcement officers who saw Barron assaulting the victim do not amount to improper

6    vouching, where these officers testified that they had no reason to lie about their

7    observations.  Further, Probation Officer Hernandez-Murray and Parole Agent Ramirez

8    testified that falsifying their reports would lead to reprimand in their respective agencies and

9    possible prosecution for perjury.  8 RT 360, 413-14.  A prosecutor may argue that

10   witnesses have no motive to lie if such arguments are based on reasonable inferences

11   from evidence in the record.  *United States v. Nash*, 115 F.3d 1431, 1439 (9th Cir. 1997).

12   By arguing that the officers "have no reason for fabrication" and that "what the defense is

13   asking you to believe is . . . that these officers are liars and that they conspired to frame an

14   innocent person," the prosecutor was not offering personal assurances of the officers'

15   credibility or referring to facts outside the record.  *See United States v. Necoechea*, 986

16   F.2d 1273, 1276 (9th Cir. 1993) ("prosecutors must have reasonable latitude to fashion

17   closing arguments, and thus can argue reasonable inferences based on the evidence,

18   including that one of the two sides is lying").  The arguments suggesting that these officers

19   had no reason to fabricate their testimony about seeing Barron holding a weapon do not,

20   therefore, amount to misconduct.  *Cf. United States v. Combs*, 379 F.3d 564, 574 (9th Cir.

21   2004) (prosecutor compounded error from improper cross-examination of defendant by

22   also arguing that government agent would risk losing his job by lying on the stand, where

23   no such evidence was introduced).

24                            **2.      Misstatement of Evidence**

25         Barron also argues that the prosecutor misstated Rodriguez's testimony during

26   closing argument.  Barron contends that during cross-examination, Rodriguez testified that

27   as he was chasing Barron, he was able to see a knife in Barron's hand until Barron crashed

28   into a signpost near a parking lot.  *See* 7 RT 222.  In closing argument, however, the

prosecutor argued that Rodriguez testified that he could not see whether a knife was in

Barron's hand after first seeing Barron in the parking lot, and that Barron must have ditched

the knife before his arrest:

> But what you do know, even from the defendant's own admission, is that he ran all over this area, folks. The knife could be anywhere. There is no way that law enforcement could have covered every inch of where defendant was that night.
>
> . . . The knife could have been anywhere, folks. He easily could have ditched it at any point.
>
> What Detective Rodriguez says is that he knows the defendant still had the knife in his hand at the point when he comes into contact with [Barron,] when he first drives into the Albertson's parking lot. The defendant sees him and runs this direction. And then he says, "At that point I didn't see anything in his hands, but I still believe he had it in his hands." But he testified that he no longer saw whether or not it was for sure in his hand.

14 RT 1957-58.

The court of appeal held that the prosecutor did not mischaracterize the evidence

and found no error:

> We have carefully reviewed the totality of Detective Rodriguez's testimony about seeing defendant with the knife. In our view, the prosecutor did not mischaracterize the evidence. Detective Rodriguez testified that when he saw a uniformed officer get out of the patrol vehicle, he approached defendant. Defendant turned around and started running back to the Albertson's parking lot. Rodriguez had started walking towards defendant and the uniformed officer, and cut off defendant's escape through the parking lot. Rodriguez again identified himself as a police officer and told defendant to stop. Defendant looped back around and headed towards Santa Clara Street. When Rodriguez intercepted defendant, he believed defendant still had the knife; defendant had something clenched in his hands. Rodriguez assumed defendant was still armed, but all he could see was the clenched hands and the gloves; he could not actually see a blade of any sort. Rodriguez gave chase. Defendant hurdled over some foot-high bushes and "somehow stumbled and went headfirst" into one of two round metal posts that supported an Albertson's sign. Defendant "kind of bounced back and fell on the ground there in the dirt corner of that shopping center."
>
> One reasonable inference from Detective Rodriguez's testimony is that defendant no longer had the knife in his hand when Rodriguez started chasing him; he had already "ditched" it. The prosecutor was entitled to argue that inference to the jury. No misconduct appears.

United States District Court
For the Northern District of California

Answer, Ex. 6 at 37.  Barron contends that the state court's finding was unreasonable because it interjected the court's own inferences from its review of the record.  Traverse at 16.

Where a state court decision is based on a factual determination, habeas relief is not granted under 28 U.S.C. § 2254(d)(2) unless the state court determination is "objectively unreasonable in light of the evidence presented in the state-court proceeding."  *Miller-El*, 537 U.S. at 340.  Here, Rodriguez testified on direct examination that when he first intercepted Barron at the parking lot, before Barron started running and then ran into the signpost, he assumed that Barron was still armed, but could not actually see a blade in Barron's hands:

> Q: Detective Rodriguez, when you intercepted the defendant at that location [in the Albertson's parking lot], can you tell us whether or nor he still had the knife?
>
> A: I believed he still had the knife. He had something clenched in his hands. And all I could see was the clenched hands and -- and the gloves. And I assumed he was still armed.
>
> Q: But at that point you couldn't actually see a blade of any sort?
>
> A: Right.
>
> Q: When he turned and continued running in the opposite direction now, did it – what occurred?
>
> A: What happened was he started running.  I gave chase again.  And right at that corner there's that – there's some more – on the corner there's – it's a dirt corner.  And it's got the Albertson's sign on it, and it's supported by two round metal posts.  And it's got a little bit of a hill. . . .
>
> And he ran in that direction, and he tried jumping, like hurdling, over the bushes and somehow stumbled and went headfirst into one of the posts and kind of bounced back and fell on the ground there in the dirt corner of that shopping center.

7 RT 195-96.  Later, on cross-examination, Rodriguez testified that he saw what he suspected was a knife, and that he believed that Barron still had a knife, but did not conclusively testify that he saw a knife in Barron's hand as he gave chase:

1    Q: And during all of that, you were able to see the – what you
     suspected was a knife in his hand; correct?

2
     A: Yes.
3
     Q: And, in fact, up until the point that he crashes into the signpost at
4    Albertson's, you – you still believed that he had the knife in his hand;
     correct?
5
     A: Yes.
6

7    7 RT 222.  In light of Rodriguez's testimony, the prosecutor's argument that Rodriguez "no

8    longer saw whether or not [the knife] was for sure in his hand," did not mischaracterize the

9    evidence presented at trial, and the state court's finding is not objectively unreasonable.

10         Even if Rodriguez's cross-examination testimony could be construed to state,

11   inconsistent with his prior testimony, that he saw a knife in Barron's hand as he gave

12   chase, the prosecutor's purported misstatement was harmless error in light of the entire

13   proceedings.  First, the trial court gave a curative instruction that "[n]othing that the

14   attorneys say is evidence.  In their opening statements and closing arguments, the

15   attorneys discuss the case, but their remarks are not evidence."  14 RT 1814.  *See Wright*,

16   625 F.3d at 613.  Further, defense counsel took the opportunity to argue the adverse

17   inference from Rodriguez's testimony to suggest that there never was a knife, based on

18   Rodriguez's testimony that he "believed – up until the time Mr. Barron crashed and

19   basically went unconscious on the ground, he still believed he had the knife.  So it's pure

20   speculation that the knife was somehow dumped someplace."  14 RT 1919.  Finally, where,

21   as here, the prosecution's case against Barron is particularly strong, "the jury's

22   deliberations are less apt to be influenced" by the prosecutor's argument emphasizing

23   Rodriguez's testimony that he did not see a knife in Barron's hand during their initial

24   encounter at the parking lot.  *Weatherspoon*, 410 F.3d at 1151.  Any error made by the

25   prosecutor in closing argument was therefore harmless.

26         The state court's denial of Barron's claims for prosecutorial misconduct was neither

27   contrary to, nor an unreasonable application of, clearly established federal law.  These

28   claims do not merit habeas relief.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

**IV.    Cumulative Error**

Barron also argues that he was deprived of a fair trial because of the cumulative impact of the several constitutional errors he has alleged in the instant petition.  In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  *See Alcala v. Woodford,* 334 F.3d 862, 893-95 (9th Cir. 2003).

This is not one of those cases.  Here, as examined above, the Confrontation Clause violation and the instances of prosecutorial misconduct at Barron's trial were harmless error.  Thus, Barron's cumulative error claim fails.

**CONCLUSION**

For the reasons set forth above, Barron's petition for a writ of habeas corpus is DENIED.  This order fully adjudicates the petition and terminates all pending motions.  The clerk shall close the file.

**CERTIFICATE OF APPEALABILITY**

To obtain a certificate of appealability, Barron must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward.  "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard.  Here, the court finds that the following issue presented by Barron in his petition meets that standard: whether the state court's exclusion of evidence to impeach Detective Rodriguez violated the Sixth Amendment right of confrontation and was not harmless error.  Accordingly, the court GRANTS the COA as to that issue.  *See generally Miller-El*, 537 U.S. at 322.

The clerk shall forward the file, including a copy of this order, to the Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

**IT IS SO ORDERED.**

Dated:  January 25, 2013

_____
PHYLLIS J. HAMILTON
United States District Judge